UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RALPH GREER, JR.,

        Plaintiff,                      Case No. 14-cv-13596

v.                                  Paul D. Borman
                                  United States District Judge

SUSAN McCORMICK, BARRETT JONES,
WESLEY SLAUGHTER, THOMAS DOTSON,
and DONOVAN WALTON, in their
individual capacities,

        Defendants.
_____/

## OPINION AND ORDER (1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 27) AND (2) GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY (ECF NO. 29)

In this 42 U.S.C. § 1983 action, Plaintiff claims that his employer violated his Fourth Amendment right to be free from an unreasonable search and seizure when it suspended and terminated him from his employment for refusing to undergo a urine drug test that was ordered without reasonable suspicion that he had used drugs in violation of company policy. Defendants respond that they did have reasonable suspicion, based on a call to their public relations department from a news reporter who passed along an anonymous tip from someone who claimed to have seen and

1

photographed a black male rolling a marijuana cigarette while sitting in a company-owned vehicle.

On March 13, 2015, this Court denied Defendants' motion to dismiss, concluding that Plaintiff had adequately alleged a Fourth Amendment violation and that "it was clearly established in September, 2013, that an uncorroborated anonymous tip, even if purportedly backed up by *undisclosed* photographic evidence, relayed second hand by a news reporter with no first hand knowledge of the facts alleged by the tipster, did not provide individualized reasonable suspicion sufficient to require an employee to submit to a urine drug test." *Greer v. McCormick*, No. 14-cv-13596, 2015 WL 1181675, at *10 (E.D. Mich. March 13, 2015) (emphasis in original.) *See Wrightsell v. City of Chicago*, 678 F. Supp. 727, 732 (N.D. Ill. 1988) ("Complaints regarding the reasonableness of a urinalysis drug test ordinarily cannot be dismissed on a motion under Fed. R. Civ. P. 12(b)(6).").

Discovery is complete and Defendants now seek summary judgment based upon qualified immunity (ECF No. 27) and Plaintiff seeks a partial summary judgment finding on the issue of liability (ECF No. 29). The parties filed Responses (ECF Nos. 32, 33) and Defendants filed a Reply (ECF No. 34). Defendants also filed a Notice of Supplemental Authority on March 28, 2017 (ECF No. 37), to which Plaintiff responded (ECF No. 38). The Court held a hearing on the cross-motions on

December 21, 2016. Following the hearing, the parties engaged in settlement discussions that were unsuccessful in resolving the case.

For the reasons that follow, the Court GRANTS IN PART Plaintiff's motion for partial summary judgment as to liability and DENIES Defendants' motion for summary judgment.

# I. BACKGROUND

## A. Plaintiff's Version of Events

The Plaintiff, Ralph Greer, began work with the Detroit Department of Water and Sewage ("DWSD") in October, 2000, and ultimately transferred to his position as a construction inspector. (ECF No. 29, Pl.'s Mot. Ex. 1, April 8, 2016 Deposition of Ralph Greer 6:17-7:4.) The DWSD is not a Defendant. The Defendants are employees of the DWSD who are sued only in their individual capacities: Susan McCormick, who was the Director of DWSD (Pl.'s Mot. Ex. 11, April 18, 2016 Deposition of Susan McCormick 5:16-66:7); Barnett Jones, who was the Chief Security and Integrity Officer for the DWSD (Pl.'s Mot. Ex. 5, March 23, 2016 Deposition of W. Barnett Jones 5:2-7); Wesley Slaughter, who was a Security Officer assigned to Special Investigations for the DWSD (Pl.'s Mot. Ex. 6, March 23, 2016 Deposition of Wesley Slaughter 6:17-24); Thomas Dotson, who was a Construction Inspector/Supervisor for the DWSD (ECF No. 27, Defs.' Mot. Ex. 5, March 23, 2016

Deposition of Thomas Dotson 3:13-18); and Donovan Walton, who was the Manager of the DWSD Maintenance and Repair Division and who was the supervisor of Plaintiff's direct supervisor, Thomas Dotson (Pl.'s Mot. Ex. 8, March 23, 2016 Deposition of Donovan Walton).

Throughout his employment with DWSD, Greer worked as a Construction Inspector and drove a DWSD panel truck to various sites to oversee the construction and repair work that private contractors performed for the DWSD. (Greer Dep. 16:19-17:8, 18:17-19.) On the date of the incident that is the subject of this litigation, Greer was assigned to a job in suburban Wyandotte and was driving a "very dark blue" Ford F335 Cargo Van with a vehicle number – 381188 – stenciled on both sides of the truck. (Greer Dep. 12:10-13:23, 15:4-18:9.) Plaintiff submitted a declaration in which he confirms that he was assigned to a job in Wyandotte on the dates in question in this case, that on those days he was driving a dark blue DWSD van and that "at no time on those days did [he] drive a DWSD van on or near Hunt Street in Detroit or on or near any street in the vicinity of Eastern Market in Detroit." (ECF No. 33, Pl.'s Resp. Ex. 15, August 24, 2016 Declaration of Ralph Greer ¶¶ 9-11.) Plaintiff's direct supervisor at the time was Thomas Dotson. (Greer Dep. 19:21-22.)

According to Plaintiff, he was sitting in his office at approximately 7:30 a.m. on September 10 or 11, 2013, when Mr. Walton, Mr. Dotson's supervisor, told

Plaintiff that security wanted to see Plaintiff downtown. (Greer Dep. 21:3-5.) Plaintiff did not inquire why but told Walton that he would stop by security when he left the office for his daily assignment. (Greer Dep. 21:6-8, 24:13-25:14.) About 30-45 minutes later, before Plaintiff left the office for his daily assignment, Walton returned and said that security called back and wanted Plaintiff to go to the clinic for a drug test. (Greer Dep. 25:15-26:7.) Plaintiff asked Walton why, and Walton stated that he did not know, he was just doing what security asked him to do. (Greer Dep. 26:15-18.) At this point, Plaintiff asked to speak with his union representative, Juanita Sanders, who was already out in the field and had to be called back to the office to meet with Plaintiff. (Greer Dep. 26:19-27:11.) When Sanders arrived, she and Plaintiff met privately in a conference room at the DWSD offices. (Greer Dep. 27:10-18.) Plaintiff asked Sanders why he had to go for a drug test, and she asked him if he had been involved in an accident with a company vehicle or if someone had claimed that he appeared to be under the influence of some type of controlled substance, to which Plaintiff responded that no, neither of those things had occurred. (Greer Dep. 27:22-28.) Sanders told Plaintiff that he did not need to go to the clinic because DWSD needed a reason to send him for a drug test and they had not given him such a reason. (Greer Dep. 28:4-7.) Sanders then had a conversation with Walton outside of Plaintiff's hearing. (Greer Dep. 29:2-5.) Walton then left Plaintiff and Sanders in

the conference room to wait, stating that security would make a decision. Walton returned less than an hour later with the 29-day suspension pending discharge paperwork, which Plaintiff signed. (Greer Dep. 29:6-30:10.) Walton made no further statements to Plaintiff or to Sanders and Plaintiff got in his personal car and drove home. (Greer Dep. 30:11-17, 31:22-32:3.) Plaintiff denies that he smoked marijuana either on September 10th or 11th, 2013 and denies that he ever smoked marijuana in a DWSD vehicle when he was on duty. (Greer Dep. 32:4-14.)

The Notice of Suspension was issued on Wednesday, September 11, 2013, by Plaintiff's direct supervisor, Thomas Dotson and by Mr. Dotson's supervisor, Donovan Walton. (Pl.'s Mot. Ex. 9, Sept. 11, 2013 Notice of Suspension.) The Notice of Suspension informed Plaintiff that he was being suspended immediately for a period of twenty-nine (29) days, with a recommendation for discharge following the suspension period. (*Id.*) The reason given for the suspension was as follows:

> Possession, consumption, use of or being under the influence of alcoholic beverages, narcotics, habit-forming drugs, or any other potentially intoxicating or potentially impairing substance during working hours or on DWSD property (Employee refused to submit to a drug and alcohol screening).

(Pl.'s Mot. Ex. 9, Notice of Suspension.)

Greer filed a grievance against his suspension, which was denied by the DWSD on September 27, 2013. (ECF No. 29, Pl.'s Mot. Ex. 13, Sept. 27, 2013 Grievance

Denial Letter from DWSD Manager Terri Tabor Conerway.) The Letter stated in part:

> A thorough review and discussion revealed that the Department received a complaint regarding Mr. Greer. Consequently, Assistant Superintendent of Water Systems Maintenance and Construction, Donovan Walton directed Mr. Greer to submit to a drug and alcohol screen. The grievant informed Mr. Walton that he was unable to submit to a screen and requested Union representation before the conversation could proceed. The grievant had an opportunity to confirm that he was not in possession or under the influence of any intoxicating or impairing substance during work hours or while on DWSD property. When given the directive to undergo a drug and alcohol screen, Mr. Greer refused. The Department views this as a refusal to follow a directive. This refusal is considered as a positive test result by default.
>
> It is Management's position that based on these findings, the aforementioned grievance is denied.

(Pl.'s Mot. Ex. 13, Sept. 27, 2013 Correspondence from Terri Conerway to Juanita Sanders.)

On October 7, 2013, the DWSD served Plaintiff with a Notice of Discharge, signed by Susan McCormick, the Director of DWSD. (Pl.'s Mot. Ex. 12.) The reason given for the discharge was as follows:

> Possession, consumption, use of or being under the influence of alcoholic beverages, narcotics, habit-forming drugs, or any other potentially intoxicating or potentially impairing substance during working hours or on DWSD property (Employee refused to submit to a drug and alcohol screening).

(Pl.'s Mot. Ex. 13, Notice of Discharge.) Ms. McCormick subsequently confirmed that Plaintiff's refusal to take a drug test was "a significant factor" in the decision to

terminate. (Pl.'s Mot. Ex. 11. McCormick Dep. 28:6-12.)

Plaintiff's discharge went to arbitration. On July 25, 2014, an arbitrator appointed under the contract between the Union and the DWSD rendered an Opinion and Award that held that the DWSD did not have "reasonable suspicion" for ordering the drug test and that the discharge of Greer violated the contractual prohibition of discipline without just cause. (Pl.'s Mot. Ex. 14, Arbitration Opinion and Award.) The Arbitrator denied back pay because he concluded that under the collective bargaining contract Greer had a duty to obey the order to submit to the test even if the order was invalid and grieve it later. (Opinion and Award 9-10.) The Arbitrator specifically declared that he was not ruling on whether the order to submit to the test or the subsequent suspension and discharge for failing to take the test violated Greer's Fourth Amendment rights. (Opinion and Award 9-10.) As a result of the Arbitration Award, Greer was reinstated as a Construction Inspector on September 8, 2014. (Greer Dep. 37:1-5.) Greer lost wages and benefits for a period of twelve months, form September 11, 2013 to September 11, 2014. (Greer Dep. 37:5-7.) As a result of his discharge, Plaintiff was forced to move in with his mother and his brother-in-law, and lost the health insurance under which he and his son had been covered at the DWSD. (Greer Dep. 38:8-40:6.)

As of September, 2013, when the incident that led to Plaintiff's termination

occurred, DWSD had published rules requiring employees to take drug tests when they were involved in accidents or when they returned from absences beyond a specified length. DWSD did not have a published policy requiring employees to submit to drug tests under any other circumstances. (Pl.'s Mot. Ex. 14, Arbitrator's Opinion and Award 3-4.)

## B. DWSD's Version of the Facts

### 1. What DWSD claims it knew on the morning of September 11, 2013, when it ordered Greer to undergo a urine drug test and suspended him pending termination for refusing to take the test.

#### a. William Wolfson - General Counsel and Chief Compliance Officer

Between 8:00 and 9:00 a.m. on the morning of September 10, 2013, Wolfson, DWSD's Chief Compliance Officer and General Counsel, received a call from DWSD public affairs director Mary Alfonso. (Wolfson Dep. 22:17-25, 25:20-21.) Ms. Alfonso, who passed away before this litigation was filed, allegedly informed Mr. Wolfson that she had just received a call from a Channel 4 Reporter, Kevin Dietz. Dietz was investigating concerns regarding issues of running water in vacant buildings in the City of Detroit, and was preparing to run a story on the issue. Dietz had been in contact with the DWSD at least as early as August, 2013, regarding the vacant building running water concerns. (Wolfson Dep. 20:12-21:9, 21:3-8, 22:25-23:21; Barnett Dep. 12:24-13:4.)

During the early morning call on September 10, 2013, Dietz also reportedly informed Ms. Alfonso, again according to Mr. Wolfson, that Dietz "had a videotape of a DWSD employee smoking a joint in a DWSD vehicle." (Wolfson Dep. 24:3-24:6.) Wolfson asked Ms. Alfonso if she had seen the videotape, which she had not, and she informed Wolfson that Dietz was "likely to run a story and certainly wanted to know what, if any, response the department would have." (Wolfson Dep. 24:7-19.) Wolfson instructed Ms. Alfonso to attempt to identify the vehicle, check the provisions in the employee's contract regarding drug testing and, if appropriate under the contract, get him tested. (Wolfson Dep. 24:21-25:2.) Ms. Alfonso indicated to Mr. Wolfson that she was concerned because Dietz indicated that he was not prepared to produce the videotape at that point. (Wolfson Dep. 26:24-27:12.)

Following the call from Ms. Alfonso, Wolfson believes that he would have contacted Mr. Barnett, the DWSD Director of Security and Integrity and asked Barnett to "touch base" with Ms. Alfonso and "see what identifying information, in fact, she had received, and then take a look and see if there were other things that would help us determine the veracity of the information that had been received." (Wolfson Dep. 30:11-31:1.) Wolfson has no specific recollection of having made the call to Barnett but believes that he would have done so and would have probably pointed out that "if the contract allowed for testing, we should consider testing from a public safety point

of view." (Wolfson Dep. 30:17-31:4.) No one at DWSD checked further with Mr. Wolfson prior to suspending Plaintiff the next morning, with a recommendation of discharge, for refusing to take the drug test. Nor did Mr. Wolfson not instruct anyone at DWSD to, nor did he himself, consider the constitutional limitations on ordering Plaintiff to undergo a drug test based on the information that was then available to the DWSD. (Wolfson Dep. 33:9-34:7.)

### b. Barnett Jones - Chief of Security and Integrity

Mr. Jones recalls that Ms. Alfonso contacted him and said that she had just received a phone call from Mr. Dietz, and that Dietz had indicated that he had received information, a phone call and a video from, Jones believed, a retired or an off-duty Detroit police officer who was in a park somewhere and indicated to Dietz that he had observed a male who was driving a DWSD vehicle who appeared to take a baggie from either under the seat or between the seats and, Jones believed, proceed to roll a marijuana cigarette and proceed to smoke it. (Jones Dep. 13:5-14:5.) Mr. Jones asked Ms. Alfonso if she had a vehicle number from the truck and inquired whether Ms. Alfonso had a copy of the video. Ms. Alfonso did give Jones the vehicle identification number but responded that Dietz refused to give DWSD the video but threatened to do his own investigation into the matter and to "put it on the news" if DWSD didn't do an investigation. (Jones Dep. 14:6-15.) Mr. Jones recalled

specifically that Ms. Alfonso told him that Mr. Dietz told her that the alleged police officer was in a park somewhere in the City of Detroit. (Jones Dep. 15:16-23.) Jones received no information from Ms. Alfonso regarding exactly where or when this alleged rolling of the joint had occurred other than that it was a DWSD vehicle in a park somewhere. (Jones Dep. 16:3-16.) Jones could not recall whether he was informed of the race or gender of the driver of the DWSD vehicle. (Jones Dep. 16:17-24.) Jones does recall that he "wanted to get his hands on the video," but that Alfonso told him that Dietz was not going to give it to him. (Jones Dep. 17:3-11.)

Jones then assigned the matter to a DWSD investigator, Wesley Slaughter, either by phone or by directly walking down to Slaughter's office. (Jones Dep. 17:15-22.) Jones recalls that he said to Slaughter exactly what Alfonso had said to him:

> I've just been advised by Mary Alfonso that we have a report from Kevin Dietz that an off-duty officer has recorded one of – possibly one of our employees in a park with – smoking marijuana or indicated that he observed him roll the marijuana cigarette and smoked the marijuana, that he was on duty in our vehicle and here's the vehicle identification number can you check it out.

(Jones Dep. 17:25-18:7.) Slaughter called Jones back shortly thereafter and informed him that the vehicle was operational, that he knew who the driver was and that he was with the driver's field supervisor, Doc Walton, who was going to call in the driver of that vehicle and, pursuant to policy, ask him to take a drug test. (Jones Dep. 18:8-19:25.)

At the time that Jones gave the assignment to Slaughter to investigate, Jones did not know where or when the alleged undisclosed video had been taken or by whom and did not know where the vehicle in question had been assigned, or would likely have been located, the morning of September 10, 2013. (Jones Dep. 20:14-21:18.) In fact, as discussed *infra*, Plaintiff was assigned to a project in suburban Wyandotte on September 10, 2013, and was not assigned to any job duties in downtown Detroit.

The next contact that Jones had regarding this issue was later that day, around 5:00 or 5:30 p.m., when Slaughter called Jones back to report that Walton "had asked Mr. Greer to go to the clinic and Mr. Greer had refused to go to the clinic and that they were following the policy which was he was being suspended pending termination." (Jones Dep. 22:4-15.) Slaughter testified that Walton reported that he had asked Plaintiff to go to the clinic and "invoked the policy which was refusal to go to the clinic for a urine sample when asked by your supervisor meant that you were suspended pending termination." (Jones Dep. 23:9-14.)

No one asked Mr. Jones whether the suspension to Plaintiff should be issued – he was simply informed that it had been done. (Jones Dep. 23:15-23.) Jones's only other recollection regarding this issue was that he continued to ask for the video and Ms. Alfonso continued to reiterate that Dietz was not going to produce the video. Jones testified:

A:      I asked her for the video.

Q:      All right. And what, if anything, did she say in response?

A:      "He's not giving us the video." And I told her that I would like to have it for the record.

Q:      All right. And why did you want it for the record?

A:      As a police officer you like to have all of your – all of any particular evidence. I knew that there had been an investigation done by one of my people, that the call had come in indicating that there was possible video, and that I would have liked to have that in the record, in the file because it completes the file.

(Jones Dep. 25:3-15.) In fact, however, Mr. Jones could not specifically recall whether Ms. Alfonso had represented that Mr. Dietz told her that there was video or whether it was still photographs, concluding that he "thought" is was videos "but it could be videos or photos. I'm not sure." (Jones Dep. 38:7-38:9.) Mr. Jones was never informed by anyone at DWSD that they actually viewed the video or photographs. (Jones Dep. 39:21-40:7.)

Mr. Jones testified that he was aware of the need for reasonable suspicion to order such a test, but that no one asked his opinion, as a police officer, whether in his view there was reasonable suspicion to require Plaintiff to be tested. (Jones Dep. 28:14-21, 32:17-21.) As a retired police officer of some 40 years, Mr. Jones had great familiarity with the concept of "reasonable suspicion," and believed it was "more than a hunch," "as in stop and frisk," and "intuitive information that you are able to perceive with your senses." (Jones Dep. 33:19-35:3.) Mr. Jones was aware that the information he received from Ms. Alfonso, i.e. that Dietz told her that an anonymous

14

source had told him that there was a video, had been double hearsay. (Jones Dep. 29:2-30:4.) Mr. Jones also indicated that he is obligated to investigate even hearsay tips and that is what he did here by assigning Slaughter to investigate. (Jones Dep. 30:3-8.) Mr. Jones testified that the DWSD gets calls from contractors who are unhappy with inspectors like Mr. Greer looking over their work. Mr. Jones acknowledged that, at the time the test was ordered, no one at DWSD knew the identity of the tipster, knew whether or not he was being truthful or whether he had a motive to be less than truthful. (Jones Dep. 30:14-31:21.) In fact, no one knew anything about the tipster other than Dietz's alleged representation (which Dietz actually denies having said, *see infra*) that the anonymous tipster was perhaps a retired police officer. Mr. Jones confirmed that the only information he received "as to what might or might not be reasonable suspicion is entirely what Ms. Alfonso told [him] that Mr. Dietz told her based on what this person told Mr. Dietz." (Jones Dep. 35:10-16.) Jones did not make any notes on Ms. Alfonso's call – after he received the call he walked down and gave the information and assignment to Slaughter. (Jones Dep. 39:14-20.) Mr. Jones believed they had reasonable suspicion here based upon the information he received in the phone call from Alfonso:

> I believe even though we had hearsay information we had cause and effect to investigate. The officer did go out and investigate. He did put together the fact that the person operating the vehicle at the time was Mr. Greer. He eliminated all the other drivers; and that he had asked Mr.

Greer with his supervisor there, he had made the supervisor aware of what the complaint was and the supervisor I believe asked Mr Greer pursuant to our policy to take a urine test.

(Jones Dep. 43:21-44:23.)  At the time that Jones reached this conclusion, he did not know that Mr. Greer had a prior drug test issue.  (Jones Dep. 45:22-46:2.)

Under the DWSD policy, the driver of the vehicle would have the right to refuse.   (Dotson Dep. 19:22-25.)   Also at the time the DWSD procedure for determining who would make the decision to require an employee to undergo a drug test "would have been a combination.  If there was an investigation that tipped the box of reasonable suspicion that would have been – information would have been given to the supervisor, and the supervisor would have had the responsibility to ask the employee to go for a drug test."   (Jones Dep. 11:22-12:5.)   One of Jones's investigative officers would call the supervisor to "make him aware that there was a need for the supervisor to read the report or partake in the information that the investigation would reveal." (Jones Dep. 12:6-12.)  The supervisor would ultimately be responsible for making the call to send someone for a drug test. (Jones Dep. 12:13-18.)

### c.    Wesley Slaughter - Investigator

Slaughter, who received the assignment from Jones to investigate the anonymous tip regarding someone allegedly rolling a marijuana cigarette in a DWSD

vehicle, understood the DWSD drug policy to dictate that "if a supervisor had reasonable suspicion that an employee may be under the influence of alcohol or illegal drugs that they could be asked to go to the clinic for testing." Slaughter understood that the if an employee turns down a request based on reasonable suspicion, the penalty is a 29-day suspension and then termination. Slaughter had never been involved in a reasonable suspicion investigation before the incident with Plaintiff. (Slaughter Dep. 7:12-8:5.)

Mr. Slaughter was contacted by Mr. Jones in person and told that Ms. Alfonso, who was the public relations person for DWSD at the time, had received information from Mr. Dietz that an off-duty or a retired police officer had observed one of our persons or employees using drugs while he was sitting in a DWSD vehicle. (Slaughter Dep. 9:7-10:24.) Jones told Slaughter it was a male, did not tell him the race, did not describe the individual, did not tell Slaughter that there was a video and did not tell Slaughter anything about when or where this incident allegedly occurred. (Slaughter Dep. 10:24-12:3.) Jones verbally gave Slaughter the vehicle identification number and asked Slaughter to find out who was driving the vehicle. (Slaughter Dep. 12:7-19.) Jones told Slaughter that he wanted the information as quickly as possible because Dietz wanted to run a story on the incident and the department did not want to suffer the negative publicity. (Slaughter Dep. 13:1-10.)

After speaking with Jones, Slaughter went down the hall and spoke directly with Ms. Alfonso, who told him that Kevin Dietz had relayed information that a DWSD employee, a black male, was observed possibly using or rolling up a marijuana cigarette while sitting in his vehicle and that Dietz had still photos of this while it was happening. Alfonso verbally repeated the vehicle number to Slaughter. (Slaughter Dep. 14:8-16.) Slaughter was not informed where the incident had occurred or where the photographs had been taken but Alfonso did give a date when this supposedly occurred, information that Slaughter needed to line up who was driving the vehicle with that number that day, and informed Slaughter that it was allegedly a black male driving the van. (Slaughter Dep. 15:3-16:8.) Neither Jones nor Alfonso mentioned or discussed with Slaughter the issue of a drug test. (Slaughter Dep. 16:16-19.)

After receiving the vehicle number verbally from Alfonso and confirming that it had been in operation on the date question, Slaughter called Donovan Walton, who was in charge of the crew to which that vehicle was assigned, and asked Walton to identify which employee had that vehicle on the date that Alfonso had given Walton. Walton called Slaughter back about an hour later and informed him that Plaintiff was assigned to the vehicle that day. (Slaughter Dep. 16:23-17:15.) Slaughter then reviewed the video logs that monitor company vehicles entering and exiting the facility and confirmed that it was Greer who did swipe in and out that day. (Slaughter

Dep. 17:16-24.)

Jones told Slaughter, as Alfonso had told Jones, that this was going to go on the news and that it was important: "It was conveyed to me by the Chief that we wanted to be ahead of this story before Mr. Dietz put out whatever he was going to do." (Slaughter Dep. 19:17-19.)   Although Slaughter did determine that Plaintiff was assigned to the vehicle that matched the number he was verbally given by Alfonso, Slaughter did not know whether that vehicle was at the location where this incident allegedly occurred and did not know the time that the incident allegedly occurred. (Slaughter Dep. 19:20-20:4.) Slaughter compiled his report regarding the identity of the individual who was assigned to the vehicle matching the number he was given and the next he knew of the situation a meeting took place the next day with himself, Plaintiff, Plaintiff's union representative and Mr. Walton. (Slaughter Dep. 21:9-22:2.)

Slaughter could not recall who initially suggested the drug test but Slaughter recommended that a drug test should be required and he told Mr. Walton that a drug test should be done. (Slaughter Dep. 22:10-24.) Slaughter testified that it was up to Walton to determine whether or not to follow Slaughter's recommendation and require Plaintiff to undergo the drug test because Walton, as Plaintiff's supervisor, had the final call on how to discipline the Plaintiff. (Slaughter Dep. 23:3-11.) Ultimately, after Slaughter explained to the Plaintiff and the union representative what the charges

were, and after conferring privately with his union representative, Plaintiff refused to submit to the test. (Slaughter Dep. 25:1-26:2.)

Slaughter testified that no one asked his opinion on whether there was reasonable suspicion to test the Plaintiff but he believed that, based solely on what Alfonso reported to Jones and to Slaughter about what Dietz told Alfonso, i.e. that an anonymous source had allegedly observed a black male in a DWSD vehicle bearing a certain number roll a marijuana cigarette, Slaughter believed that there was reasonable suspicion to test Plaintiff after they determined that the vehicle identification number they received verbally from Dietz matched the vehicle assigned to Plaintiff that and that Plaintiff drove that day. Nothing further was learned before Plaintiff was required to submit to a urine drug test. (Slaughter Dep. 27:4-28:2.) Slaughter prepared his report on September 10, 2013 and gave it to Jones. His report did not note the date on which these recorded events allegedly occurred, although Slaughter admitted that was important information. (Slaughter Dep. 29:21-31:19.) Slaughter made the recommendation to require the test before the meeting with Plaintiff, Walton and the union representative. (Slaughter Dep. 29:17-23.)

Slaughter testified that he tried to contact Dietz himself but never received a return phone call from Dietz and never followed up or spoke to Dietz about the incident. (Slaughter Dep. 31:20-32:12.) Slaughter testified that he had no information

whatsoever to corroborate the identity of the tipster, did not know if he was a police officer (retired or otherwise), knew nothing about his credibility, his trustworthiness or motives yet conceded that the veracity of the allegations underlying the decision to require Plaintiff to undergo a drug test rested entirely on the credibility of the tipster, about whom the DWSD knew nothing:

> Q:  So am I correct in terms of the allegation that there was some criminal activities, specifically smoking weed or rolling weed or whatever or anything rests on how credible this guy is; doesn't it?
> A:  Yes.
> Q:  And we don't know anything about him?
> A:  Yes. No, we don't know anything about the guy.
> Q:  So we don't know how credible he is, do we?
> A:  No.

(Slaughter Dep. 33:17-34:7.)

### d. Donovan Walton - Manager of Maintenance and Repair - Plaintiff's Indirect Supervisor

Mr. Walton testified that he was the supervisor of Plaintiff's direct supervisor, Thomas Dotson. (Walton Dep. 4:21-25.) Walton received a call from Slaughter around 8:00 a.m., on a date he could not specifically recall, asking him to determine who was driving a certain vehicle with a given number on a certain date. Walton did not give Dotson any background on why he needed the information. Walton called Dotson and asked him to determine who was driving that vehicle and Dotson checked and reported to Walton that it was Plaintiff. (Walton Dep. 6:21-10:5.) Walton then

conveyed the information to Slaughter over the telephone but still at this point had not been told what this was all about or why Slaughter needed the information. (Walton Dep. 11:2-8.) Slaughter then told Walton to have Plaintiff report to security. Slaughter still did not tell Walton why. (Walton Dep. 11:2-12:6.) Five minutes later, Slaughter called Walton back and said: "Have Mr. Greer report to a clinic for a drug and alcohol screen." Slaughter still had not told Walton anything about the situation – nothing about the call from Dietz or the tip – and did not ask Walton to do any independent investigation and did not ask Walton's opinion on the request to send Greer for a drug screen. (Slaughter Dep. 12:10-13:15.) Walton did not know where Plaintiff had been assigned to work on the date in question, and did not know where Plaintiff would have been at 9:00 a.m. on that day. (Walton Dep. 22:17-22.) Slaughter instructed Walton to have Plaintiff transported to the clinic. Walton testified that Slaughter has the authority to issue that order to Walton. (Walton Dep. 12:10-13:15.)

Walton then called Plaintiff into his office (Walton did not recall that anyone else was in the room) and informed him that security wanted him to be transported to the clinic for a drug and alcohol screen. Plaintiff asked why and Walton replied that he did not know the reason he was just informed by security to send Plaintiff to the clinic. (Walton Dep. 13:18-14:6.) Walton testified that "off the cuff" he asked

Plaintiff, as he usually does when a drug test is required, whether Plaintiff could pass the test. Walton testified that Plaintiff told Walton that he "did something over the weekend" and could not pass the test. Walton did not put this in his report because it was "just between me and him and it's more like hearsay." (Walton Dep. 14:7-22.)

Walton testified that Plaintiff then asked to meet with his union steward, whom he conferred with in private and then came back after ten to fifteen minutes and stated that based on what his union representative told him, without probable cause DWSD could not send him for the test, and the union representative said there was no such cause and so Plaintiff refused to go. (Walton Dep. 15:4-16:6.) Walton explained to Plaintiff that they would treat this as a refusal and Walton called Slaughter and others in human resources to report Plaintiff's refusal. (Walton Dep. 16:8-24.) Walton was told by the people in human resources to stand by for further instruction and then someone called him back and said that they would be issuing the suspension. Walton then received the directive to issue the suspension, which was probably prepared by human resources and emailed to him, which he signed and dated September 11, 2013. Walton testified that he was given a directive to sign and issue the suspension, and that "given the circumstances" he wanted to do it. (Walton Dep. 20:11-25.) Walton prepared a "Statement of Facts," that indicated he received a call from Slaughter on Wednesday, September 11, 2013 at 8:45 a.m. asking who was driving "such and such

a vehicle on the preceding day," September 10, 2013, at approximately 9:00 a.m. (Walton Dep. 21:19-22:12.)  Walton did not know where Plaintiff was assigned to work or where Plaintiff would have been on the morning of September 10, 2013. Walton testified that Slaughter was not present when he issued the suspension to Plaintiff but that he was carrying out Slaughter's order to send Plaintiff for a test and that he made no decision of his own to send Plaintiff for a test.  Walton was never informed of the facts allegedly supporting the order for Plaintiff to undergo a drug screen, i.e. the call from Dietz regarding the photos/video, until much later in the case – after the suspension.  He suspended Plaintiff based on what he was told to do. (Walton Dep. 24:1-25:7.) Walton did not tell anyone about the alleged comment from Plaintiff regarding being unable to pass the test due to activities over the weekend to anyone else at the DWSD. (Walton Dep. 16:25-17:25, 18:13-19:19.) Walton testified that he had no independent basis to suspect that Plaintiff had been using marijuana or had it in his vehicle.  (Walton Dep. 28:12-18.)

### e. Thomas Dotson - Construction Inspector Supervisor – Plaintiff's Direct Supervisor

Thomas Dotson, Plaintiff's direct supervisor, testified that Plaintiff was assigned to work on a job in Wyandotte on the days in question.  (Dotson Dep. 7:1-24.)  Plaintiff, like other construction inspectors, would report to the DWSD office first thing in the morning to do paperwork and receive his assignment for the day.

24

Plaintiff's shift began at 7:00 a.m. and he knew his assignment was in Wyandotte and because it is a long drive, approximately 45 minutes, Plaintiff did not usually stay long at the office. (Dotson Dep. 7:11-24.) Dotson first learned of the situation when Walton called Dotson into his office early in the morning one day in September, 2013, and said "you need to go get Ralph and bring him to my office." (Dotson Dep. 9:25-10:9.) Dotson testified that Walton told him that there was a complaint against Greer but he didn't say what it was. "At some point" Walton told him there was a video of Plaintiff in a vehicle smoking marijuana and that Plaintiff was being asked to go to the clinic at once. Walton did not mention anything about where this occurred or the time at which it occurred but he did mention the day of the week it was alleged to have occurred. (Dotson Dep. 10:10-11:25.)

Dotson got Plaintiff and brought him to Walton's office and the three of them spoke. Walton told Plaintiff that he had received a phone call from security and that Plaintiff had to go to the clinic to take a test. Plaintiff said he did not want to take the test and asked to talk to his union steward. Dotson recalls that Walton asked Plaintiff if there was any reason he couldn't pass the test and Plaintiff said yes because he did something over the weekend. (Dotson Dep. 12:25-14:7.) Plaintiff then spoke with his union representative and came back in the room and said the union recommended that he not take the test because there is no random drug testing. Then both Plaintiff and

Dotson left the room while Walton called security because Dotson was "not privy to any of the conversations with security." (Dotson Dep. 14:8-15:14.) After Walton called security, he called Plaintiff back in and informed Plaintiff that, per DWSD security, Plaintiff was going to be suspended because he refused to take the drug test. (Dotson Dep. 15:11-24.) Walton handed Plaintiff a suspension that both Walton and Dotson had signed. Dotson testified that he was asked to sign the suspension because he was Plaintiff's immediate supervisor but he didn't really want to sign it. Dotson testified that he "just didn't understand and [] had nothing to do with the reason for his suspension." (Dotson Dep. 16:17-17:2.) No one ever asked Dotson his opinion as to whether Plaintiff should be discharged. (Dotson Dep. 19:2-5.)

2. **What DWSD claims it learned after suspending Plaintiff on September 11, 2013, with a recommendation for discharge based on a presumed positive drug test, and before October 7, 2013, when it carried out the discharge.**

In 2013, McCormick, as the Director of DWSD, had three different individuals reporting to her on matters of labor relations and employment: William Wolfson, Barnett Jones, and Terri Conerway, the Director of Human Resources. (McCormick Dep. 6:14-7:1.) In general, if there was a reason for a termination, McCormick would get a report from Mr. Jones as to what investigation he would do and she would also get a recommendation from Ms. Conerway as to what she thought the appropriate action should be. (McCormick Dep. 8:8-11, 9:21-25.) In this case, McCormick

26

would have seen the notice of suspension, which is a 29-day suspension during which there can be a grievance and determination, followed by a determination on termination. Ms. Conerway would forward the suspension notice to McCormick and would make a recommendation regarding termination. (McCormick Dep. 9:6-20.)

The first McCormick recalls becoming aware of the issue with Plaintiff was on September 13, 2013, two days after Plaintiff was suspended, when she was scheduled to do an interview with Kevin Dietz regarding public concern and complaints over the running water in abandoned buildings in the City of Detroit. Dietz, as an investigative reporter, had visited some of the sites where there was running water and was looking to the DWSD to explain why there was running water in abandoned buildings that was not being shut off in a timely fashion. (McCormick Dep. 10:10-23.) In advance of that scheduled meeting, McCormick received a call from Ms. Alfonso informing McCormick that Dietz also had some information regarding some independent report and some documented evidence regarding an employee's alleged activities smoking marijuana in a DWSD vehicle. (McCormick Dep. 10:23-11:20.) After the interview with Dietz regarding the running water issue, McCormick and Dietz had a conversation about the third-party evidence Dietz had received. Dietz wanted to know what DWSD was doing about the situation that he brought to their attention about the anonymous tip and evidence. McCormick explained to Dietz that

it would be very difficult for the DWSD to move forward with anything without the alleged third-party evidence, i.e. the alleged photographic or video evidence. McCormick asked if she could view the evidence and Dietz displayed portions of a video on a small screen hand held device, probably a cell phone. (McCormick Dep. 12:2-14:14.)

All that Ms. McCormick could discern from the video was that there was a vehicle number visible (she does not recall if it was legible or not but she did not make a note of the number if it was) on the side of the truck, and there was an employee in the truck smoking something that did not look like a standard cigarette (it was "crimped on the edges"). She did not recall if the individual was actually smoking the cigarette but it was visible in the individual's mouth. McCormick did not see any "rolling" of a cigarette and believed that the video was shot through a driver-side window. (McCormick Dep. 14:15-15:19.) She does not think she would be able to identify the individual driving the vehicle if she saw the person again. (McCormick Dep. 16:9-11.) McCormick asked Mr. Wolfson to follow up on the investigation and that was the end of the discussion of the subject that day. (McCormick Dep. 18:18.) McCormick does not recall specifically that Jones or Wolfson reported back to her regarding the investigation; she only recalls that they determined that the vehicle was assigned to Plaintiff and that he was under investigation. (McCormick Dep. 20:1-11.)

McCormick had no input into the decision to suspend the Plaintiff, which was made on September 11, 2013, before Ms. McCormick sat down with Dietz for the running water interview and learned, for the first time, about his alleged third-party evidence of marijuana being rolled or smoked in a DWSD vehicle. The suspension with a recommendation of discharge was a decision made by human resources without McCormick's knowledge or input. (McCormick Dep. 28:14-19, 31:6-14.) Before making the ultimate decision to approve the termination, McCormick had a conversation with Ms. Conerway and learned that Plaintiff had refused to submit to a drug test. McCormick explained the discharge decision process as follows:

> I make the decision based on what I see in the investigation. Mr. Jones will advise me as to, you know, his findings and he will share those with Ms. Conerway. Ms. Conerway ultimately will make a recommendation, and again, then ultimately I sign-off on the recommendation if I believe it's appropriate.

(McCormick Dep. 23:25-24:5.)

In this particular case, Ms. McCormick made the decision to terminate based on (1) the fact that Plaintiff refused to submit to a drug screen which is viewed as a presumptive positive result; (2) the video that she viewed and that Mr. Wolfson viewed that showed a DWSD vehicle being driven by an individual who was either rolling or smoking what looked like a marijuana cigarette; (3) the fact that the number reportedly seen on the vehicle was the number of the vehicle assigned to Plaintiff on

the day in question.  (McCormick Dep. 25:17-28:5.)  McCormick did not independently verify the number that she viewed on the vehicle in the video.  Ms. McCormick testified that the Plaintiff's refusal to take the drug test was a "significant factor" in the decision to terminate.  (McCormick Dep. 28:6-12.)  At the time of the decision to discharge, DWSD still had not been able to get a hold of the actual video.  (McCormick Dep. 28:20-29:6.)  Notably, McCormick was certain that the van in the video she viewed was white.  (McCormick Dep. 32:25-33:2.)  It is undisputed Plaintiff was driving a dark blue van on September 10, 2013.  Ms. McCormick could not determine from the video whether the individual driving the van was black or white and she was certain that the view in the video was through the driver's side window and not through the front windshield.  (McCormick Dep. 33:23-34:6.)

### 3. The facts according to Kevin Dietz and his tipster, learned after Plaintiff's suspension and discharge.[1]

#### a. Sunny Miller – the tipster.

Reluctantly, the anonymous tipster ultimately agreed to be deposed after Kevin Dietz disclosed his identity in this litigation.  The tipster was Sunny Miller, who actually has never worked as police officer despite the information allegedly received

---

[1] In reaching its decision on the parties' cross-motions for summary judgment, the Court does not rely on any information that was not known to the Defendants at the time of the constitutionally challenged conduct.

by the DWSD from Dietz that the anonymous tipster was either an off-duty or retired police officer. (Miller Dep. 6:1-7.) Although Miller refused to answer a number of questions regarding his "profession," it appears that he worked as a private investigator with some training in criminal investigation. (Miller Dep. 6:14-25.) Miller testified, after several times refusing to answer and ultimately placing a call to Kevin Dietz on the record at his deposition, that he has sources at all of the networks and relationships with all of the local television channels, and has known Dietz for several years and provided him "information" on multiple occasions. (Miller Dep. 7:10-8;7, 11:24-12:2.) Miller testified that he has connections to the DWSD through the legal department because the DWSD owes him $68,000 in apparent fees for investigative work, money that was owed at the time of the "anonymous tip" that is the subject of this lawsuit, and that DWSD, according to Miller, has never paid. Miller implied at the deposition that the DWSD had agreed to fix his water in exchange for his testimony in this case. (Miller Dep. 12:25-15:1.)

Miller testified that when he saw the individual in the DWSD vehicle handling marijuana, he was in the City of Detroit at 2200 Hunt Street near the Eastern Market. He testified that he shot several pictures and some video from the second floor of the building, through the windshield of the vehicle, of a black male with a large head reaching down under the driver's seat to retrieve a baggie, then reach for a clipboard

off the dashboard and proceed to roll "weeds," that were not the color of tobacco, in a cigarette and to lick the paper, put the cigarette in his mouth, and pull away stuffing the baggie back underneath the seat. He did not actually see the individual light the cigarette and smoke it. (Miller Dep. 15:16-21:17.) As he was shooting the still photographs, he called Dietz on the phone to tell him what he was seeing and he began to shoot video. He then sent the photos and the video to Dietz's cell phone. (Miller Dep. 21:18-25.) Miller was adamant that his photos and video were shot through the windshield of the vehicle, looking down on the vehicle from a second story window. (Miller Dep. 23:3-10.) Miller claims to have captured the number of the vehicle on his photographs and video, and testified adamantly that the numbers were on the rear of the vehicle. (Miller Dep 24:23-25:4, 45:5-25.) The whole process of stopping, rolling the cigarette and driving away took approximately six to eight minutes. (Miller Dep. 25:21-26:2.) He does not think that the driver ever lit the cigarette. (Miller Dep. 26:3-9.) He thought the incident occurred around noon. (Miller Dep. 39:5-12.) When shown a picture of Plaintiff, Miller believed that he could identify him as the individual driving the DWSD vehicle. (Miller Dep. 46:16-47:13.)

Miller testified that he knew he had something in these photos and video that Dietz would be interested in due to his previous relationship with Dietz – i.e. he knew Dietz was working on a case involving the DWSD. (Miller Dep. 27:1-11, 34:11-

35:4.)  About a month after the incident, when talking with Dietz on an unrelated matter, Miller asked about the DWSD driver incident and was told that the guy was terminated so he erased all of the evidence from his phone.  He has no evidence of the vehicle number or anything else that was depicted in the photos or the video.  (Miller Dep. 28:6-25, 51:5-15.)  Miller could not explain why he called a news reporter instead of calling the DWSD or the police when he witnessed this DWSD driver rolling and possibly smoking marijuana on the job, while driving a DWSD vehicle. (Miller Dep. 47:14-48:10.)

   **b.**  **Kevin Dietz – the reporter.**

  Kevin Dietz denied that he ever possessed a video and testified that he had two or three still pictures of a water truck and a person in the water truck sent to him on his phone.  Dietz did not witness the events that were depicted on the photos himself and never possessed any actual photos – only the photos on his cell phone.  (ECF No. 29-4, Pl.'s Mot. Ex. 3, December 9, 2015 Deposition of Kevin Dietz 7:5-8:24.)  He testified that he showed these photos to Ms. McCormick and perhaps Mr. "Wilson" at the September 13, 2013, interview regarding the running water.  He does not recall contacting anyone at DWSD about the pictures before the September 13, 2013

meeting with McCormick.[2]  (Dietz Dep. 9:3-19.)

Dietz recalls that the photos depicted a blue truck with white numbers, and an African-American male in the driver's seat.  Dietz did not recognize the location and did not learn from Miller where the pictures were taken.  He did believe that it was somewhere in the City of Detroit.  (Dietz Dep. 10:4-11:20.)  Dietz could not tell from the photos what the person was doing at the time, but was told by Miller that he had seen the person roll a marijuana cigarette in the vehicle but Dietz could not see that happening in the photos.  (Dietz Dep. 11:21-12:20.)  Dietz testified that he had to call Miller back to get the vehicle number from him, verbally, over the phone.  (Dietz Dep. 12:21-13:9.)  Dietz does not recall telling anyone at DWSD anything about the person who gave him the photos, i.e. that he was a retired police officer.  (Dietz Dep. 14:11-19.)  Dietz denies that he showed McCormick or anyone else at DWSD the photos on his phone the day of the September 13, 2013 interview.  (Dietz Dep. 18:9-19:15, 22:5-9.)  Dietz recalled that they showed video of the water in one of the abandoned houses but he does not recall showing any photos of the marijuana incident.  As far as Dietz knows, only he and his source ever saw the pictures.  (Dietz Dep. 22:10-23:4.)  Dietz

[2]  Although Dietz's testimony that he does not recall placing the September 10, 2013 telephone call to the DWSD contradicts the DWSD employee's testimony, Plaintiff does not dispute the Defendants' version of the facts, which establish that Dietz did place a call to the DWSD on September 10, 2013, regarding the events allegedly reported to him by Miller.

recalls that at the September 13, 2013 meeting, he called his source and got the number of the van and gave it to McCormick. (Dietz Dep. 24:23-25:16.) Dietz recalled that the photos depicted a blue truck with white numbers and he reaffirmed that these were still photos and not videos. (Dietz Dep. 26:1-9.) Dietz did not recall being asked by anyone at DWSD for the photos and believes he would have given them copies had they asked to see if they could find out more about it. Dietz would not have disclosed his source to the DWSD. (Dietz Dep. 26:13-24.) Dietz reiterated on cross-exam that he has no recollection of seeing somebody roll a joint in the photographs and if he had he believes he would remember. (Dietz Dep. 31:11-17.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present

evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote and internal quotation marks omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). At the same time, plaintiff must produce enough evidence to allow a reasonable jury to find in his favor

by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc*., 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Ultimately, the party who bears the burden of proof must present a jury question as to each element of the claim. *See Davis*, 226 F.3d at 511. Plaintiff cannot meet that burden by relying solely on "[c]onclusory assertions, supported only by [his or her] own opinions." *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008). Plaintiff must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004)).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed.R.Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be

admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Ibid*. It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

When the Court is faced with cross-motions for summary judgment, each motion must be evaluated on its merits and in light of the applicable burdens at the summary judgment stage:

The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

\*　　　\*　　　\*

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly*

*Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991).

> When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F.Supp.2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat–Tech Liquidating Trust v. Fenster*, 981 F.Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense"). The plaintiff therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it would be entitled to a directed verdict at trial." William W. Schwarzer, et al., The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

*Ely v. Dearborn Heights School Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015).

Here, Plaintiff bears the burden of establishing each element of his § 1983 claim and also bears the burden of establishing that the governing law was clearly established. Thus Plaintiff, in its motion for summary judgment, bears a heavier burden than Defendants on their motion for summary judgment:

> Tapper's summary judgment burden is greater. Because it seeks summary judgment on claims for which it has the burden of persuasion, Tapper's showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for [it]." See *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material

Fact, 99 F.R.D. 465, 487–88 (1984)). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to Chubb. *See Matsushita*, 475 U.S. at 587.

*Tapper's Fine Jewelry, Inc. v. Chubb Nat'l Ins. Co.*, 14-cv-13280, 2015 WL 9268750,

at *4 (E.D. Mich. Dec. 21, 2015).

All evidence submitted in opposition to a motion for summary judgment must

ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed.R.Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Ibid*. It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

## III.    ANALYSIS

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation

of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In determining whether the government officials in this case are entitled to qualified immunity, we ask two questions: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff has shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 538-39 (6th Cir. 2008). All facts and factual inferences are drawn in favor of the nonmovant. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). If multiple government officials are alleged to have violated a plaintiff's Fourth Amendment rights, each officer's conduct must be analyzed individually. "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008)).

"The doctrine of qualified immunity protects government officials 'from

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity requires the court to determine: (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and (2) "whether the right at issue was "clearly established" at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (citations omitted). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id*. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236.

The Sixth Circuit has adopted the following familiar analysis for determining whether a right is clearly established:

> For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the

violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, —— U.S. ——, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011) (citing *Saucier*, 533 U.S. at 201–02, 121 S.Ct. 2151). Thus, "[t]he relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

"We look first to the decisions of the Supreme Court, and then to the case law of this circuit in determining whether the right claimed was clearly established when the action complained of occurred." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002) (citing *Black v. Parke*, 4 F.3d 442, 445 (6th Cir. 1993)). "[T]he case law must 'dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.' " *Id.* (quoting *Saylor v. Bd. of Educ. of Harlan Cnty.*, 118 F.3d 507, 515 (6th Cir. 1997)). Plaintiffs bear the burden of showing the claimed right was clearly established. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).

*Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012). "'We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Flying Dog Brewery, LLP v. Michigan Liquor Control Comm'n*, __F. App'x__, 2015 WL 968278, at * 11 (6th Cir. March 5, 2015) (quoting *al-Kidd*, 131 S. Ct. at 2013). The inquiry requires the Plaintiff to point to "controlling authority" or "a robust consensus of cases of persuasive authority" to demonstrate that the right was clearly established. *Hidden Village, LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 529 (6th Cir. 2013).

## A.    The Reasonable Suspicion Requirement

The parties agree that the issue presented is whether the Defendants had constitutionally supportable "reasonable suspicion," based on "individualized suspicion of wrongdoing," of on the job drug use when they made the decision to order Greer to undergo a urine drug test and to suspend and discharge him for refusing that test.[3]  *See Chandler v. Miller*, 520 U.S. 305, 313 (1997) ("To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion

---

[3] There is no genuine issue of material fact that Plaintiff was terminated in this case for asserting his Fourth Amendment right to be free from an unreasonable search.  The DWSD had a zero tolerance drug policy that also provided that a refusal to submit to a drug test was treated as a positive test resulting in termination. DWSD's counsel confirmed at the hearing on the motions that DWSD has a policy of zero tolerance for drug use and deems a refusal to undergo a requested drug screen as a positive result.  Slaughter also confirmed this DWSD policy, pursuant to which refusal to take a drug test results in: "Termination.  Discipline leading up to termination."  (Slaughter Dep. 7:12-23.)  Plaintiff was aware that his refusal would result in discharge before he signed his suspension.  (Greer Dep. 30:3-10.)  And Plaintiff grieved his "discharge" long before McCormick finalized his termination.  (ECF No. 28-15, Pl.'s Mot. Ex. 14, Arbitration Order at 2, PgID 707.)  *See Cummerlander v. Patriot Preparatory Academy, Inc.*, 86 F. Supp. 3d 808, 816 (S.D. Ohio 2015) (observing that "the Supreme Court and the Sixth Circuit have held that public employees cannot be given a stark choice between asserting a constitutional right and losing their jobs") (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ("If a search is unreasonable, a government employer cannot require that its employees consent to that search as a condition of employment.")).  There is no genuine issue of material fact that Plaintiff's continued employment was conditioned on his consent to submit to the drug test and his termination was based upon his refusal, which was an automatic positive result and grounds for termination per the DWSD Human Resource Director, Terri Conerway.  (Arbitration Order at 6, PgID 711.)  The Court rejects Defendants' attempt to analogize this case to *Clemente v. Vaslo*, 679 F.3d 482 (6th Cir. 2012), in which the Sixth Circuit held that: "What is clearly established is only that public employers may not coerce their employees to abdicate their constitutional rights on pain of dismissal, and that is not what happened here."  But that is what happened here.

of wrongdoing."). The parties further agree that the relevant inquiry in this matter is limited to the circumstances existing, and the facts known to the individuals who ordered the search, at the time the urine test was ordered and Plaintiff was terminated.

This "reasonable suspicion" test, as applied in the public employer context, was recognized nearly thirty years ago in this Circuit in *Smith v. White*, 666 F. Supp. 1085, 1089-90 (E.D. Tenn. 1987), *aff'd* 857 F.2d 1475 (6th Cir. 1988) (affirmed *per curiam* following briefing and oral argument "based on the reasoning of the district court"):

> It is now clear that a urinalysis is a search and seizure within the meaning of the Fourth Amendment. *McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir. 1987); *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 176 (5th Cir. 1987); *Lovvorn v. City of Chattanooga*, 647 F. Supp. 875, 879 (E.D. Tenn. 1986). The Fourth Amendment proscribes only unreasonable searches and seizures. Whether a search is unreasonable depends on the context within which it takes place. *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985). In the case of searches conducted by a public employer, a determination of reasonableness requires a balancing of the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control and the efficient operation of the workplace. *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714, 724 (1987).

> The balancing process requires a determination as to whether the urinalyses were justified at their inception. The governmental interest in having a drug free work force to protect and operate the most vital areas of a nuclear power plant is patently obvious. This Court and others have held that drug urinalyses may be conducted when there is "reasonable suspicion." *See Lovvorn v. City of Chattanooga*, 647 F.Supp. at 881; *National Treasury Employees Union*, 816 F.2d at 117. The Court rejects plaintiffs' contention that the defendants could not have had "reasonable suspicion" with respect to any of them unless actual observed behavior

indicated that their job performance was influenced by drugs. Reasonable suspicion is a lesser standard than probable cause. There is reasonable suspicion when there is some articulable basis for suspecting that the employee is using illegal drugs. *Lovvorn*, 647 F.Supp. at 881. Put another way, there is reasonable suspicion when there is some quantum of individualized suspicion as opposed to an inarticulate hunch. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); *Lovvorn*, 647 F. Supp. at 882. Reasonable suspicion may be based on statements made by other employees and tips from informants. Even probable cause can be based on informants' tips when the totality of the circumstances indicates a fair probability of accuracy. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). In this case, the defendants had no reason to doubt the statements of Lieutenant Daniel and other employees. The defendants even checked out part of the information obtained from Daniel insofar as it was possible to do so without compromising the secrecy of this investigation. The information which TVA officials had formed an ample basis for their conclusion that they had reasonable suspicion to test the plaintiffs.

666 F. Supp. at 1089-90. *See also Wrightsell*, 678 F. Supp. at 732 (citing *Smith* and holding that "reasonable suspicion is a lesser standard than probable cause . . . [and requires] some articulable basis for suspecting that the employee is using illegal drugs. . . . [and] some quantum of individualized suspicion as opposed to an inarticulate hunch") (alterations added).  In *Knox County Educ. Ass'n v. Knox County Bd. Of Educ.*, 158 F.3d 361 (6th Cir. 1998),  the Sixth Circuit applied these principles and found that the County's suspicion-based drug testing policy "sufficiently limit[ed] the discretion of the officials administering the rule" because the testing was "clearly based upon a finding of individualized suspicion," thus "comport[ing] with the

reasonableness requirement of the Fourth Amendment."[4] *Id.* at 385 (alterations added).

Plaintiff relies on several cases discussing the concept of "reasonable suspicion" in the context of criminal stop and detain cases. In that context, it has long been established by Supreme Court and Sixth Circuit precedent that uncorroborated anonymous tips, standing alone, cannot form the basis for reasonable suspicion to stop and detain. "Unlike known or identified informants, anonymous tipsters, without more, cannot be deemed reliable regarding their allegations." *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003) (citing *Florida v. J.L.*, 529 U.S. 266, 268 (2000)); *Alabama v. White*, 496 U.S. 325, 329-32 (1990) (holding that an anonymous tip must be corroborated to some degree by additional indicia of reliability to support a finding of reasonable suspicion); *Bazzi v. City of Dearborn*, 658 F.3d 598, 605 (6th Cir. 2011) ("reasonable suspicion requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person") (internal quotation marks and citations omitted); *United States v. Caruthers*, 458 F.3d 459, 465-66 (6th Cir. 2006) (noting that information received from unknown tipsters are especially unreliable

---

[4] Notably, none of the illustrative circumstances under which suspicion-based testing was permitted under the Knox County policy permitted a search based on an uncorroborated anonymous tip. Indeed, none of the requirements in the policy approved in *Knox County* permitted officials to rely on "tips" of any type. 158 F.3d at 385.

because a "tipster who refuses to identify himself may simply be making up the story" and giving anonymous tip "little weight in the reasonable suspicion calculus"). *See also United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008) ("The honesty of the caller, the reliability of his information, and the basis of his knowledge are closely intertwined issues that may usefully illuminate the commonsense, practical question of whether there is reasonable suspicion.") (internal quotation marks and citation omitted); *United States v. Blackshaw*, 367 F. Supp. 2d 1165, 1172-73 (N.D. Ohio 2005) (citing *Feathers* and observing that "when an anonymous tip is neither supported with "indicia of reliability" nor corroborated with police observation, it cannot provide an officer reasonable suspicion," and finding that "[i]n the few instances when the Sixth Circuit has [found] reasonable suspicion predicated on an anonymous tip, such suspicion has always been built upon more than the tip itself") (alterations added).

As they did in their motion to dismiss, Defendants suggest that the criminal search and detainment cases have little relevance in determining what constitutes 'reasonable suspicion' to drug test a public employee. As the Court noted in its Opinion and Order denying the motion to dismiss, Defendants themselves rely on such criminal cases when discussing the reasonable suspicion standard that they submit should be applied in this case. And, in fact, these criminal cases have informed the

debate on public employee drug testing since the Sixth Circuit affirmed the district court in *Smith* in 1988. *Smith*, affirmed without opinion and "based on the reasoning of the district court," 857 F.2d 1475 (6th Cir. 1988) (table case), expressly relied on *Terry v. Ohio*, 392 U.S. 1 (1968), the quintessential stop and frisk case, when determining the appropriate standard to be applied in the public employee context. Similarly, in *Relford v. Lexington-Fayette Urban County Gov't*, 390 F.3d 452, 458 (6th Cir. 2004), the Sixth Circuit applied the reasonable suspicion framework, expressly citing *Terry v. Ohio* as the basis for the standard, in the context of a Fourth Amendment challenge to a mandatory drug screen in the public employer context. Defendants are wrong to suggest that the "search and detainment" cases have no bearing on the "reasonable suspicion" inquiry in the public employee context. The rationale and holdings of the stop and detain cases have "clear applicability" in the public employee context. (*See infra* at Section III(C) discussion regarding the clearly established prong of the qualified immunity analysis.)

As early as 2003, the Sixth Circuit had acknowledged that "[t]he Supreme Court had emphasized the importance of establishing the reliability of anonymous tips in 1990 . . . and had re-affirmed that principle in *[Florida v. ]J.L.*, [529 U.S. 266 (2000)], decided just a few months before this incident." *Feathers*, 319 F.3d at 851 (alteration added). In fact, as the Court noted in its prior Opinion and Order, Defendants concede

that such "tips" cannot stand alone and must have some degree of corroboration. The Sixth Circuit in *Smith* in 1988 acknowledged the applicability of this standard in the context of compulsory urinalysis in the public employer context, as did other federal district courts at that time. *See, e.g., Armington v. School Dist. of Philadelphia*, 767 F. Supp. 661, 666-67 (E.D. Pa. 1991) ("The constitutional requisite for the compulsory urinalysis is reasonable suspicion that plaintiff was under the influence of drugs or intoxicants. . . Since the drug test in this case was not to be conducted pursuant to a random or other suspicionless drug-testing program, the standard of reasonable suspicion is appropriate. . . . The suspicion must be directed at a particular individual . . . . Although the reasonable suspicion standard lacks some specificity, one court has noted that factors that may effect the reasonableness of the suspicion are (1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other facts contributing to suspicion or lack thereof.") (internal quotation marks and citations omitted).

As discussed at length *infra* in Section III(C), public officials in 2013 had an obligation to establish the reliability of an anonymous tip before conducting a search based on the information provided in that tip. Even more so when the anonymous tip, which itself contains insufficient individual details, is relayed second hand by a news reporter with no first hand knowledge of the events allegedly relayed by the tipster.

It is beyond debate that in the context of information relayed as a tip, the Court must consider "the nature of the tip and the degree of corroboration."[5]  It goes without saying that an anonymous tip, that is one that comes from a source that is completely unknown to the public official, lacks any degree of corroboration.[6]

Defendants suggest that the anonymous tip in this case that was passed from Dietz (a news reporter threatening the DWSD with adverse publicity) to Alfonso should be treated like the anonymous tip conveyed by a police dispatcher to officers in the field in *Feathers*.  The Court disagrees.  In *Feathers*, expressly relying on the unique relationship between law enforcement officers and their dispatcher, the Court held that the officers were entitled to qualified immunity where they relied on, and were under no obligation to independently verify, information passed on to them by

---

[5] Although the DWSD did not have a suspicion-based testing policy in 2013, as early as 1988, the Model State Drug Testing Statute provided that reasonable suspicion could be based upon a "report of drug use provided by a reliable and credible source[] and which has been independently corroborated."  Evans, Model State Drug Testing in Employment Act (Pittstown, NJ 1988).  *See also Ford v. Dowd*, 931 F.2d 1286 (8th Cir. 1991) (police superintendent cannot require officer to submit to drug testing based on an unsubstantiated rumor).  This is simply a general principle that was too evident even to be questioned as of September, 2013.

[6] It is undisputed that, other than the anonymous tip in this case, there is no evidence to contradict Plaintiff's sworn testimony that on September 10 and 11, 2013, he was assigned to a job in Wyandotte and did not drive a DWSD van on or near the Hunt street location, or anywhere near the Detroit Eastern Market, where the tipster allegedly obtained his photographic or video evidence.  It is also undisputed that the DWSD had approximately 40-60 similar vans in operation in September, 2013. (McCormick Dep. 33:8-11.)

a police dispatcher. "Although this information was from an anonymous tipster, whose information was not sufficient to create reasonable suspicion under *J.L.*, the officers knew only what had been reported from the dispatch, and efficient law enforcement requires—at least for the purposes of determining the civil liability of individual officers—that police be permitted to rely on information provided by the dispatcher." 319 F.3d at 851. No such relationship exists here between Dietz and the DWSD that would justify anyone at DWSD blindly relying on his hearsay recitation of an anonymous tip. *See United States v. Colon*, 250 F.3d 130, 135-38 (2d Cir. 2001) (finding the imputed/collective knowledge cases inapplicable where the person conveying the information on which the government official acts had no "training, responsibility or authority to make a determination of reasonable suspicion"). Everyone in the decision making chain at DWSD was aware that Dietz had no first hand knowledge of the events he described and that the source of the tip was completely unknown and further that the source was not going to be disclosed and neither were the alleged videos/photos. The DWSD acted on an anonymous tip with absolutely no corroboration which was clearly insufficient to provide them with reasonable suspicion in this case. That it was funneled to them through a news reporter does nothing to remove the unconstitutional taint. Defendants' reliance on *Feathers* is misplaced.

There is no dispute in this case that the DWSD made no effort to corroborate or establish the reliability of Dietz's tip. It is undisputed that, at the time that the urine test was ordered, no one at DWSD was aware of where these alleged videos/photos were taken, or by whom they were taken. Despite the fact that Director McCormick determined that "it would be very difficult [] to move anything forward without at least, you know, being able to view and see the third-party evidence . . .," this is exactly what occurred when Slaughter, through Walton and Dotson, ordered the drug urine test without any degree of corroboration of Dietz's story. (McCormick Dep. 12:24-13:6.) It is also not irrelevant to the analysis that, at the time DWSD received the "tip" from Dietz, Ms. Alfonso was aware that Mr. Dietz was doing an investigative story on accusations that the DWSD was improperly handling the problem of running water in abandoned buildings. Ms. Alfonso allegedly was concerned that Mr. Dietz would "go public" with the uncorroborated tip about a DWSD driver rolling and possibly smoking marijuana in his DWSD vehicle and she urged Jones to act with haste to avoid potential public revelation of the wholly unsubstantiated information. Jones, in turn, asked Slaughter to act with haste, which Slaughter did. Of course avoidance a possible public controversy is not a justifiable basis for violating an

employee's constitutional rights.[7]

The DWSD insists that it did corroborate the "tip" because they were able to match up the number that was verbally reported to them with the van that was assigned to Plaintiff on the alleged day in question. That the DWSD was able to match that number to Plaintiff's van, and to further determine as they did that Plaintiff was driving a van bearing that number that day, does nothing to increase the reliability of the information on which they acted in deciding to order the urine test. First, the reliability of the number as reported must be questioned. It is undisputed that no DWSD employee *ever saw* photographic or video evidence of the vehicle number that Dietz had reported to them over the phone. Even McCormick and Wolfson, who claim to have seen "video evidence" of the reported incident after Plaintiff had already been suspended pending his termination, did not claim to have identified or recorded the number of the vehicle in the videos that they claim to have seen. And Dietz did not claim to have seen photographic or video evidence of that number himself and had

<hr>

[7] Also as it turns out, although this was not a fact known to the DWSD at the time and therefore not something that the Court can consider in evaluating the Defendants' conduct, the tipster had a personal dispute with the DWSD about an alleged $68,000 that he was owed by the DWSD. (Miller Dep. 12:25-13:20.) The Court does not consider this testimony in reaching its resolution of the parties' motions. The information simply highlights why establishing the reliability of an anonymous tip is essential and what the DWSD may have learned had they bothered to attempt to corroborate the tip – that the tipster had a personal bias against the DWSD – knowledge that might have caused them to question the reliability of the tip.

to call his source back to obtain, again only verbally, the vehicle number from him. This means that the six-digit vehicle number was relayed verbally at least five or six different times by five or six different individuals before it reached Dotson (through Walton) who actually matched the number he received to the vehicle that Plaintiff was driving that day. There were 40-60 DWSD vans in service in 2013, each bearing a six-digit vehicle number.

Even assuming that the number was accurately recorded by Miller, then accurately verbally conveyed by Miller to Dietz, then accurately verbally conveyed by Dietz to Alfonso, then accurately verbally conveyed by Alfonso to Jones, then accurately verbally conveyed by Jones to Slaughter, then accurately verbally conveyed by Slaughter to Walton and finally accurately conveyed by Walton to Dotson, the constitutional taint occurred when DWSD acted on an uncorroborated anonymous tip in the first place. Even if DWSD accurately conveyed that tainted information through its ranks, this does not create the basis for a reasonable suspicion in the first place that a DWSD employee was violating company policy by smoking marijuana in a company vehicle the morning of September 10 or 11 at the Hunt street location. Regardless of whether DWSD did a thorough job of determining to whom a vehicle bearing the number verbally conveyed to them sixth-hand had been assigned on the day in question, the constitutional violation occurred when the DWSD decided to rely

on information received through an uncorroborated anonymous in the first place. *See Hudson v. City of Riviera Beach*, No. 12-cv-80870, 2014 WL 1877412, at *9-11 (S.D. Fla. May 9, 2014) (finding, in the public employer "reasonable suspicion" drug test context, that factual allegations that employer relied "on the sparse, secondhand information of an employee without investigating or corroborating the employee's claim" sufficiently stated a Fourth Amendment claim).

Defendants suggest that the Court should consider it significant in the reasonable suspicion analysis that Dietz had "personally possessed or seen photographic or video evidence corroborating the report." (Defs. Mot. 14.) Importantly, there is no evidence in the record that Dietz ever *saw* photographic or video evidence of the vehicle number – the evidence that Defendants claim supplied their "reasonable suspicion." As discussed *supra*, a television news reporter has no special relationship with the DWSD such that his word should be blindly relied upon by DWSD employees. And while Dietz may or may not have reported that he personally viewed the photos or video, it is undisputed that the DWSD knew that he was relaying information he had received from an anonymous source. There is no genuine issue of material fact that the DWSD witnesses were aware that Dietz had no personal knowledge of the events depicted in those photos or videos. Thus, Dietz's tip was only as good as his source, about whom DWSD employees confirmed they

knew absolutely nothing:

> Q: So am I correct in terms of the allegation that there was some criminal activities, specifically smoking weed or rolling weed or whatever or anything rests on how credible this guy is; doesn't it?
>
> A: Yes.
>
> Q: And we don't know anything about him?
>
> A: Yes. No, we don't know anything about the guy.
>
> Q: So we don't know how credible he is, do we?
>
> A: No.

(Slaughter Dep. 33:17-34:7.)[8]

Even viewing the facts, and all reasonable inferences from those facts, in the light most favorable to the Defendants, the evidence demonstrates that the DWSD failed to corroborate the anonymous tip from Dietz and acted without constitutionally supportable individualized suspicion when it ordered Plaintiff to undergo a drug test and terminated him for refusing. As McCormick, the Director of the DWSD, testified

---

[8] Defendants suggest that the fact that McCormick and Wolfson actually viewed portions of the video enhances the reasonable suspicion to test the Plaintiff. However, it is undisputed that Plaintiff had already been suspended with a recommendation of termination for refusing the drug test *before* McCormick and Wolfson allegedly viewed portions of the videos. Additionally, McCormick testified emphatically that she viewed a white DWSD vehicle in the video and it is undisputed that Plaintiff was driving a dark blue DWSD vehicle. McCormick also testified that the video was shot through the driver's side window (Mr. Miller testified he shot his video through the windshield looking down on the vehicle) and McCormick could not independently verify the number of the vehicle from the video she saw, nor could she determine whether the driver was black or white. (McCormick Dep. 33:2-34:6.) Thus, not only was the claimed "viewing" of the video evidence by McCormick and Wolfson subsequent to the underlying constitutional violation, but the evidence of that viewing is fraught with genuine issues of material fact. Indeed, if anything, the subsequent viewing of the video as described by McCormick and Wolfson, which depicted a white van, an unrecognizable black male and a number that neither of them recalled noting, should have caused them to question the credibility of the anonymous source.

in her deposition, it would be difficult to move forward against anyone at the DWSD without the photographic or video evidence to corroborate the tip. Yet this is exactly what the DWSD did when it required Plaintiff to undergo a drug urine screen and then terminated him for his refusal to comply.

Plaintiff has carried his burden on his cross-motion for partial summary judgment to establish, even viewing the facts in the light most favorable to the DWSD, that no reasonable juror could conclude that the DWSD had constitutionally supportable individualized reasonable suspicion when it ordered Plaintiff to undergo a drug test and terminated him for refusing violated Plaintiff's Fourth Amendment right to be free from an unreasonable search.

**B.**    **The Special Needs Safety Exception to the Reasonable Suspicion Requirement Does Not Apply In This Case**

Defendants suggest that they did not need "reasonable suspicion" to test the Plaintiff based on the "safety-sensitive" nature of Plaintiff's job. The Supreme Court has held that the reasonable suspicion requirement generally applied when government employees are required to undergo testing for drugs and alcohol can be relaxed when the employee is engaged in certain "safety-sensitive" positions, which present "special needs" that justify a diminished expectation of privacy. *See Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989) and *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989). The exception has been limited to

those professions that involve employees who assume "'duties fraught with such risks of injury to others [and themselves] that even a momentary lapse of attention can have disastrous consequences.'" *Penny v. Kennedy*, 915 F.2d 1065, 1067 (6th Cir. 1990) (quoting *Skinner*). The exception has been extended to categories of employees that fall within this description, i.e. police and firefighters, customs and border agents, etc. Importantly, and dispositive here, the Supreme Court and the Sixth Circuit have made clear that such drug-testing programs must be known to employees and must be subject to specific procedures to avoid indiscriminate application of the test:

> Although *Von Raab* and *Skinner* generally validate urinalysis for individuals in the categories of plaintiffs here, it by no means necessarily follows that all of the protections of the fourth amendment have thereby been fully satisfied regardless of the integrity of the test and of the manner and means by which the test is given. So much is apparent in the language of Justice Kennedy in *Von Raab*, where he observed that the intrusion of the drug-testing program challenged there was defined narrowly and specifically, particularly since the employee subject to testing "knows that he must take a drug test, and is likewise aware of the procedures the [Customs] Service must follow in administering the test. A covered employee is simply not subject 'to the discretion of the official in the field.'" *Von Raab*, 109 S.Ct. at 1391 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 532, 87 S.Ct. 1727, 1732–33, 18 L.Ed.2d 930 (1967)); *see also Skinner*, 109 S.Ct. at 1422 ("In light of the limited discretion exercised by the railroad employers under the regulations . . . we believe that it is reasonable to conduct such tests in the absence of a warrant or reasonable suspicion that any particular employee may be impaired.").

*Penny*, 915 F.2d at 1067-68.

Defendants' revisionist attempt to now fit this case within the special needs safety exception fails. It is undisputed that in 2013, the DWSD had no systematic and uniformly applied safety-sensitive testing program in place. Even if the Court were to conclude that a construction inspector for the DWSD fits the type of profession in which the exception has been constitutionally applied, e.g. nuclear power plant workers, police officers, border patrol agents, firefighters, bus drivers, there is no genuine issue of material fact that Plaintiff in this case was singled out based on an anonymous tip and required to undergo a "reasonable suspicion" drug test. No reasonable juror could conclude that Plaintiff was asked to undergo the drug test based upon some systematic and uniformly applied safety sensitive testing program because there is no evidence that the DWSD had such a program in place and the evidence is undisputed that Plaintiff was asked to undergo a urine drug screen based upon alleged "reasonable suspicion" of drug use.

**C.    Plaintiff's Right to be Free From This Unreasonable Search Was Clearly Established in 2013**

Defendants insist that even if they violated Plaintiff's constitutional right to be free from an unreasonable search, they are protected by the doctrine of qualified immunity because it was not clearly established in 2013 that their conduct violated Fourth Amendment standards for such a "reasonable suspicion" search in the public employer context. Defendants, in a recent filing of Supplemental Authority, suggest

that the Supreme Court's decision in *White v. Pauly*, ––– U.S. –––, 137 S.Ct. 548, 551 (2017) has changed the analysis of the clearly established prong. (ECF No. 37, Supplemental Authority.) But subsequent Sixth Circuit cases interpreting *Pauly* confirm that the case, while a strong reminder to courts not to define constitutional rights at too general a level, has not changed the clearly established analysis in any profound way. It remains the law that there need not be a case specifically factually on point to alert a government official to the fact that his conduct is beyond the bounds of constitutional tolerance:

> Law-enforcement officers enjoy qualified immunity from suit when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, ––– U.S. –––, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (quoting Mullenix v. Luna, ––– U.S. –––, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015)). In evaluating whether Defendants violated King's clearly established rights, even though we give King all reasonable inferences, we consider "only the facts that were knowable to" Defendants. *Id*. at 550. And it is a "longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.' " *Id*. at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Ibid*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "Otherwise, [p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Ibid*. (quoting *Anderson*, 483 U.S. at 639, 107 S.Ct. 3034).

*King v. Harwood*, __F.3d__, 2017 WL 1130881, at *10 (6th Cir. March 27, 2017). In

the next breath, the Sixth Circuit in *Harwood* then relied on several long standing

general principles of Fourth Amendment law that provided sufficient clarity on the

facts of that case to deny the government officials qualified immunity:

> *That said*, individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has "made, influenced, or participated in the decision to prosecute the plaintiff" by, for example, "knowingly or recklessly" making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants.

*Id*. (emphasis added).

The Sixth Circuit also interpreted and applied *Pauly* in *Arrington-Bey v. City*

*of Bedford Heights*, __F. App'x__, 2017 WL 729730, at *3 (6th Cir. Feb. 24, 2017),

reaching the opposite conclusion regarding the clarity of the right at issue there:

> "[C]learly established law" may not be defined at such "a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). It must be more "particularized" than that. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012). The Supreme Court recently reminded us that a plaintiff must identify a case with a similar fact pattern that would have given "fair and clear warning to officers" about what the law requires. *White v. Pauly*, ––– U.S. ––––, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (quotation omitted). The district court, we note, did not have the benefit of *Pauly*. But we do, and accordingly we must follow its lead. Immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id*. at 551 (quotation omitted). The "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

Arrington-Bey has not pointed to, and we have not found, any case like this one—a case showing to "all but the plainly incompetent" that the officers at the scene immediately needed to seek medical treatment or that the jailers had to do the same once he arrived at the prison.

2017 WL 729730, at *3.

*Pauly* did not change the law, it merely reaffirmed that the "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Arrington-Bey*, 2017 WL 729730, at *3 (citing *Saucier*, 533 U.S. at 202). *Pauly* does not require that a plaintiff now identify a case directly factually on point if existing precedent places the statutory or constitutional question beyond debate.

It is Plaintiff's burden to establish that the law placing Defendants' actions beyond the realm of constitutionally permissible conduct was clearly established at the time. Here, Plaintiff has pointed to several cases that would demonstrate to "all but the plainly incompetent" public official that they needed, but did not possess, sufficient evidence of individualized reasonable suspicion in this case. It was clearly established in this Circuit in September, 2013, at a minimum through *Smith*, *Knox, Terry, J.L.*, *Feathers* and *Caruthers,* that public officials in the employment context could require reasonable suspicion testing only on a finding of individualized suspicion of wrongdoing and that such officials had an obligation to establish the reliability of an anonymous tip before conducting a reasonable suspicion search based

64

on the information provided in that tip. It was clearly established that relying on an uncorroborated tip, phoned in by a news reporter who had not personally observed the facts he relayed but claimed to possess photographic or video evidence (which he refused to disclose) of those facts, evidence that was supplied to the news reporter via cell phone by an anonymous source (whom he refused to disclose), without any attempt to corroborate the reliability of the tip, would violate the Fourth Amendment.

Defendants suggest that the right here was not clearly established because Plaintiff was in a "safety sensitive" public position, not in a law enforcement situation, and that therefore the cases clearly establishing the constitutional dimensions of reasonable suspicion in the law enforcement context cannot inform an official in the public employment context of what constitutes "reasonable suspicion." The Court disagrees. The Supreme Court, the Sixth Circuit and other federal circuit and district courts, as well as numerous state courts, have all drawn on the "reasonable suspicion" standard developed in the law enforcement context to resolve drug testing issues in the public employer context. *Smith v. White*, quoted at length *supra*, expressly adopted the reasonable suspicion standard for application in the public employer context, as did *Relford*, *supra*, and explicitly defined that standard with reference to its development in the law enforcement context, specifically relying on the classic stop and frisk case of *Terry v. Ohio*, and directly adopting the standards from that context

as they relate to reasonable suspicion based on anonymous tips: "[T]here is reasonable suspicion when there is some articulable basis for suspecting that the employee is using illegal drugs. Put another way, there is reasonable suspicion when there is some quantum of individualized suspicion as opposed to an inarticulable hunch." *Smith*, 666 F. Supp. at 1090. The Sixth Circuit affirmed the district court in *Smith*, *see Smith v. White*, 857 F.2d 1475 (6th Cir. 1988) (based on the reasoning of the district court), and in *Penny*, *supra*, Judge Wellford in his concurring opinion cited the Sixth Circuit's *Smith* decision as an example of a case that defines the constitutional standards for reasonable suspicion testing in the public employer context. *Penny*, 915 F.2d at 1071 (Wellford, J. concurring).

Defendants suggest that the Supreme Court and the Sixth Circuit may perhaps apply some type of hybrid test in the future where the basis for the search is reasonable suspicion but the test is required in the public employer context. In support of this suggestion, Defendants rely on those cases that have authorized suspicionless testing in the context of safety sensitive public employment. The Sixth Circuit made clear in *Penny* that a public employer who intends to subject its employees to random suspicionless testing based on the safety sensitive nature of their work, "must narrowly and specifically define its drug testing program so that the employees subject to such testing both know that they are subject to such random

66

testing, and, more importantly, are aware of the procedures the City must follow in administering the testing program." 915 F.2d at 1069 (citing *Von Raab*, 109 S. Ct. at 1391) (Martin, J. concurring). As discussed *supra*, the DWSD did not have a suspicionless testing policy (indeed they did not even have a published reasonable suspicion policy) and they did not purport to rely on such a random testing program when they terminated the Plaintiff for refusing an alleged "reasonable suspicion" demand for testing. Defendants cite no authority for the proposition that the Supreme Court or the Sixth Circuit would accept and apply the diminished constitutional protections found tolerable in cases like *Skinner* and *Von Raab* to a search based on individualized suspicion of wrongdoing and not on a suspicionless testing policy made known to employees. Indeed, to do so would gut the reasonable suspicion requirement altogether and would strip suspicionless testing of the constitutional protections required by *Von Raab*, *Skinner* and *Penny*.

Defendants in this case concede that the tip they received required corroboration. They cite no authority for the proposition that the degree of corroboration required for a search based on reasonable suspicion is something less than that required in the law enforcement context due to the nature of public employment in general. Yes, *Von Raab* and *Skinner* clearly established that reasonable suspicion is not a constitutional floor and that suspicionless testing is constitutionally

permissible in certain recognized contexts. But Defendants in this case did not act in that context and cannot reinvent the basis for their search now. The DWSD did not have a suspicionless testing policy and did not purport to act pursuant to such a policy when requiring the Plaintiff to submit to a drug test. If the DWSD was concerned about its employees being on the road under the influence of drugs, they should have adopted a suspicionless drug testing policy that may or may not have passed constitutional muster under the principles announced in *Skinner* and *Von Raab* and the like. But the DWSD had no such policy and they cite no authority that would require the conclusion that the law governing the Defendants' conduct in ordering a drug test based on reasonable suspicion was not clearly established because of unsupported conjecture that the Supreme Court or the Sixth Circuit might one day conclude that the reasonable suspicion standard requiring individualized suspicion of wrongdoing, which the Supreme Court and the Sixth Circuit have determined apply in the public employer context, can be overriden by some general corporate concern, not announced to employees in the form of published policy, about safety. The Defendants cannot claim there is an absence of clearly established law by hypothesizing some unrecognized and legally unfounded hybrid extension of existing precedent. Defendants in essence argue that some lesser quantum of reasonable suspicion was required of them here because of the safety sensitive nature of the Plaintiff's job. But

this was not the basis for the test in this case and Defendants had announced no such policy to its employees. DWSD's after the fact assertion of the need for some degree of "suspicionless testing" that was not defined in any DWSD policy and not made known to DWSD employees lacks the very protections that were deemed essential in *Von Raab* and *Penny*. DWSD did not have a suspicionless drug testing policy and we are not called upon to evaluate its constitutionality. Nor are we obligated to issue an advisory opinion on the subject. "Plaintiff was not selected for urinalysis testing according to a random or routine drug program which guarded against discriminatory or arbitrary selection of employees to be tested. Consequently, . . . in the absence of uniform or systematic random selection of employees subject to drug testing, we will allow the Government to enforce drug testing where the employees are chosen 'only on the basis of a reasonable suspicion.'" *Ford v. Dowd*, 931 F.2d 1286, 1291-92 (8th Cir. 1991) (noting that "the routine nature of particular plans in [*Von Raab* and *Skinner*] guarded against their arbitrary application to tested employees," and observing that those cases "contrast sharply" with the situation where an employee is singled out for an individualized test not required by an established plan or policy in which case the constitutional minimum is reasonable suspicion).

The Court concludes that it was clearly established in this Circuit in 2013 that a government official acting in the public employer context, even a plainly

incompetent government official, would have known to look to the clearly established law developed in the law enforcement context and the public employer context to determine whether he or she had sufficient reasonable suspicion, based on individualized suspicion of wrongdoing, to require an employee to undergo a drug screen. In fact, it is clear from the testimony of the DWSD officials that they were aware that this standard governed their conduct and each of them testified that they wanted, but were unable, to obtain the photographic evidence allegedly captured by an anonymous individual, about whose credibility they conceded they knew nothing. Had Defendants examined that clearly established law, it would have informed even the most incompetent of them that the constitution prohibited relying on a second hand recitation of facts from a news reporter, that described events not observed first hand but learned from an anonymous source whose identity would not be disclosed and thus whose credibility could not be determined.

Even viewing the facts in the light most favorable to the Defendants, i.e. that Defendants received a call from Dietz indicating that he had received photographic evidence from an anonymous source that a DWSD employee in a DWSD vehicle bearing the vehicle number 38118 was rolling a marijuana cigarette, Plaintiff has met his burden and presented sufficient evidence that the law clearly established that the Defendants acted on insufficiently reliable information in requiring the Plaintiff to

surrender his Fourth Amendment rights on threat of termination. It is undisputed that the DWSD employees were aware that Dietz had no first hand knowledge of the events he was reporting, that he was passing on information received from a source whom he refused to disclose and possessed only photographs from that source that he also refused to disclose. Slaughter, who claims to have spoken directly with Alfonso, testified that the entire basis for their reasonable suspicion was what was observed and allegedly photographed by an individual about whom the DWSD knew absolutely nothing. (Slaughter Dep. 33:17-34:7.) No other DWSD testified differently and no DWSD employee claims to have obtained the vehicle number based on personally viewing the photographic or video evidence. The "corroboration" that the Defendants claim to have performed, i.e. taking the vehicle number verbally reported to them second hand from Dietz, passing it through several DWSD employees and ultimately matching it to Greer, assumed the reliability of the very uncorroborated information on which they relied. Corroborating the uncorroborated certainly cannot suffice to meet the constitutional requirements of reasonable suspicion. No further inquiry was ever made of Dietz to determine whether he had actually even viewed the vehicle number himself (which it turns out he had not) or if he had simply relied on the verbal recitation of the number from his anonymous source (which it turns out he had). Surely the DWSD employees cannot fulfill their constitutional duty by simply failing

to ask the most rudimentary and essential questions and then seek the cloak of qualified immunity.

The Sixth Circuit has confirmed the principle that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Baynes v. Cleland*, 799 F.3d 600, 611 (6th Cir. 2015) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The Court concludes that clearly established law placed the unconstitutionality of Defendants' conduct beyond debate and that no reasonably competent officer would have required Plaintiff to undergo a drug test or face termination based solely on the uncorroborated anonymous tip relayed by Dietz in this case.

### D. Genuine Issues of Material Fact Remain on the Issue of the Personal Involvement of Certain Defendants

If multiple government officials are alleged to have violated a plaintiff's Fourth Amendment rights, each official's conduct must be analyzed individually, and only those officials who had sufficient personal involvement in the constitutional violation can be held liable. "Each defendant's liability must be assessed individually based on his own actions." *Binay*, 601 F.3d at 650. The issue of personal involvement is a legal determination to be made by the Court. But when that determination is dependent on genuinely disputed material facts, those facts must be determined by the trier of fact. Only then, based on those factual determinations, can the Court make the

legal determination regarding each Defendant's personal involvement. *See McKinney v. Lexington-Fayette Urban County Gov't*, 651 F. App'x 449, 462-68 (6th Cir. 2016) (unpublished) (finding district court's decision to defer ruling on qualified immunity pending further factual development regarding the individual officer's subjective beliefs was sufficiently individualized).

Plaintiff has established a Fourth Amendment violation, and has established that the law prohibiting the search was clearly established at the time, entitling Plaintiff to summary judgment on the issue of liability and requiring denial of Defendants' motion for summary judgment. However, questions of fact remain regarding which Defendants had sufficient personal involvement in the constitutional violation to be held liable under § 1983. These questions of fact are created by the Defendants' own inconsistent testimony, which preclude the Court's legal determination of personal liability at this stage. *Warren v. Bd. of Educ. Of City of St. Louis*, 200 F. Supp. 2d 1053, 1063 (E.D. Mo. 2001) (holding that "although the question of reasonableness [of the suspicion that employee was using drugs] is one for this Court to ultimately make, the jury must hear the underlying facts and determine those") (alteration added).

Jones testified that DWSD policy required Plaintiff's supervisor, Dotson, to make the final call whether to require the drug test or not. Dotson, who signed

Plaintiff's suspension, maintains that he had no idea what the facts were that supported the request for the test and that he was carrying out Slaughter's order. Walton, who also signed Plaintiff's suspension, likewise testified that Slaughter had the authority to make the call and instructed Walton, without ever supplying the underlying facts, to order Dotson to order Plaintiff to take the test. Slaughter testified that he had no authority to order the test and that Dotson was responsible for making the final call.

At one point in his deposition, Dotson recalled that "at some point [Walton] did mention that there was a complaint made. There was supposedly a video of him in a vehicle smoking marijuana or – so Ralph was asked to go to the clinic at once." (Dotson Dep. 9:25-10:19.) But Walton emphatically stated at least three times in his deposition that he was never given the information regarding Dietz's call, i.e. he was never advised of the allegation that Greer was on video rolling or smoking marijuana, at any point before the suspension was given and only learned of those allegations "way later into the case." (Walton Dep. 5:15-20; 8:7-11; 11:2-8; 12:2-6.) Walton specifically testified, when asked whether Slaughter told him about a phone call from Dietz or an alleged report, that he had not been told anything of that nature before he suspended him for his refusal to report for the test. (Walton Dep. 12:12-13:7.) In fact, Walton testified that when Greer asked him why he was being sent for a test, Walton

replied: "I don't have the reason why. . . . I was just informed by security to send you to the clinic." (Walton Dep. 14:1-6.) This of course calls into question whether Dotson's testimony that Walton "mentioned that there was a complaint made," and Dotson's further statement that "there was supposedly a video of Greer in a vehicle smoking marijuana," suggests that Dotson learned of the video *before* he ordered Greer to report for the drug test and suspended for his refusal. In any event, Dotson never offered any detail regarding how he came to learn of "the video" or what details the video allegedly contained or how it came into existence or how it came to the attention of the DWSD. In the end, Dotson testified that he did not want to sign Greer's suspension because he "didn't understand and [] really had nothing to do with the reason for the suspension." (Dotson Dep. 17:1-4.) He acknowledged that at the time he issued the suspension he was not aware of any evidence that Greer was in possession of or under the influence of any illegal drug. (Dotson Dep. 17:5-11.)

Because Dotson and Walton both admitted to having no understanding of the detailed facts underlying the alleged reasonable suspicion for ordering the test, any suspension by them on these facts would have clear constitutional infirmities even apart from the unreliability of the tip from Dietz. Jones states that no one consulted him when the final decision to test was been made but Slaughter states that he compiled his report for Jones's approval. And Jones, who was Slaughter's supervisor,

testified that he formed the opinion, based on forty some years as a police officer, that there was reasonable suspicion to test. Resolution of these disputed factual issues are necessary to inform the Court on the issue of each of these Defendant's personal involvement in the constitutional violation.

Plaintiff has carried his burden to demonstrate the personal involvement of McCormick, who made the final decision to terminate the Plaintiff based upon his refusal to undergo the drug screen. However, a determination of the personal involvement of Defendants Jones, Slaughter, Walton and Dotson, and hence their individual liability under § 1983, must await the determination of disputed facts by a jury, which also will be charged with determining Plaintiff's damages.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion for Summary Judgment, GRANTS IN PART Plaintiff's Motion for Partial Summary Judgment on Liability, and will issue a pre-trial Scheduling Order within the next week.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: April 10, 2017

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 10, 2017.

s/Deborah Tofil
Case Manager